**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **LEOPOLD LACOSTE, II** | **CIVIL ACTION** |
| **VERSUS** | **NO. 19-10333** |
| **CAPTAIN DANIEL HONEYCUTT** | **SECTION: "G"(3)** |

## REPORT AND RECOMMENDATION

Petitioner, Leopold Lacoste, II, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the petition be **DISMISSED WITH PREJUDICE**.

On December 13, 2012, petitioner was convicted of identity theft, having a value of $1,000 or more, of a person age sixty or older.[1] On November 13, 2013, he was found to be a fourth offender and was sentenced as such to a term of thirty years imprisonment without benefit of probation or suspension of sentence.[2] On November 12, 2014, the Louisiana First Circuit Court of Appeal affirmed his conviction, habitual offender adjudication, and sentence.[3] The Louisiana Supreme Court then denied his related writ application on November 16, 2015.[4]

On November 29, 2016, petitioner filed an application for post-conviction relief with the state district court,[5] which he later supplemented.[6] That application was denied in part on February

---

[1] State Rec., Vol. 3 of 6, transcript of December 13, 2012, p. 139; State Rec., Vol. 2 of 6, minute entry dated December 13, 2012; State Rec., Vol. 2 of 6, jury verdict form.
[2] State Rec., Vol. 3 of 6, transcript of November 13, 2013; State Rec., Vol. 3 of 6, minute entry dated November 13, 2013; State Rec., Vol. 3 of 6, Amended Reasons for Sentence.
[3] State v. Lacoste, No. 2014 KA 0499, 2014 WL 5840239 (La. App. 1st Cir. Nov. 12, 2014); State Rec., Vol. 4 of 6.
[4] State v. Lacoste, 184 So. 3d 22 (La. 2015); State Rec., Vol. 4 of 6.
[5] State Rec., Vol. 4 of 6.
[6] State Rec., Vol. 4 of 6.

10, 2017,[7] and his related writ applications challenging that ruling were denied by the Louisiana First Circuit Court of Appeal on June 16, 2017,[8] and the Louisiana Supreme Court on September 22, 2017.[9] After an evidentiary hearing, the state district court then denied his remaining post-conviction claims on January 10, 2018,[10] and his related writ applications were likewise denied by the Louisiana First Circuit Court of Appeal on May 29, 2018,[11] and the Louisiana Supreme Court on February 25, 2019.[12]

In the interim, petitioner had filed a motion to correct illegal sentence with the state district court on August 3, 2017.[13] That motion was denied on September 25, 2017,[14] and his related writ applications were denied by the Louisiana First Circuit Court of Appeal on March 23, 2018,[15] and the Louisiana Supreme Court on February 25, 2019.[16]

Petitioner then filed the instant federal application seeking habeas corpus relief on May 10, 2019.[17] The state filed a response conceding that the application is timely and that petitioner exhausted his remedies in the state courts; however, the state argues that petitioner's claims have no merit.[18]

---

[7] State Rec., Vol. 4 of 6, Order.
[8] State v. Lacoste, No. 2017 KW 0483 (La. App. 1st Cir. June 16, 2017); Supplemental State Rec., Vol. 1 of 1.
[9] State v. Lacoste, 228 So. 3d 745 (La. 2017); Supplemental State Rec., Vol. 1 of 1.
[10] State v. Lacoste, No. 635841, 2018 WL 9439904 (La. Dist. Ct. Jan. 10, 2018); State Rec., Vol. 5 of 6.
[11] State v. Lacoste, No. 2018 KW 0273, 2018 WL 2458855 (La. App. 1st Cir. May 29, 2018); State Rec., Vol. 6 of 6.
[12] State v. Lacoste, 264 So. 3d 436 (La. 2019); State Rec., Vol. 6 of 6.
[13] State Rec., Vol. 4 of 6.
[14] Supplemental State Rec., Vol. 1 of 1, Order dated September 25, 2017.
[15] State v. Lacoste, No. 2018 KW 0024, 2018 WL 1448699 (La. App. 1st Cir. Mar. 23, 2018); Supplemental State Rec., Vol. 1 of 1.
[16] State v. Lacoste, 264 So. 3d 435 (La. 2019); Supplemental State Rec., Vol. 1 of 1.
[17] Rec. Doc. 1.
[18] Rec. Doc. 9.

# I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002); accord Langley v. Prince, 926 F.3d 145, 155 (5th Cir. 2019) (noting that the AEDPA imposes a "relitigation bar" on claims adjudicated on the merits by the state court).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary

to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." <u>Bell</u>, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

<u>Wooten v. Thaler</u>, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." <u>White v. Woodall</u>, 572 U.S. 415, 426 (2014). However, a federal habeas court must be mindful that "an unreasonable application is different from an incorrect one." <u>Bell</u>, 535 U.S. at 694; <u>accord</u> <u>Harrington v. Richter</u>, 562 U.S. 86, 102-03 (2011) ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." (quotation marks omitted)); <u>Langley</u>, 926 F.3d at 156 ("The Supreme Court has repeatedly held that it is not enough to show the state court was wrong."); <u>Puckett v. Epps</u>, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application

of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

Therefore:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement. In other words, the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.

Langley, 926 F.3d at 156 (citations and quotation marks omitted). "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." Id. at 170.

> Further, the Supreme Court has expressly cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Woodall, 572 U.S. at 426 (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

In summary, "AEDPA prevents defendants – *and federal courts* – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010) (emphasis added). The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. Woodall, 572 U.S. at 417.

## II. Facts

On direct review, the Louisiana First Circuit Court of Appeal summarized the facts of this case as follows:

> The defendant's father, Leopold Charles Lacoste, Sr. ("Polo"), testified at trial that he discovered a Citibank credit card in his name while running a credit check on himself. The address on the credit card application was that of his ex-wife, Linda Thibodaux.[FN 1] Polo testified that he had not given Linda or either of their sons permission to use his identifying information to acquire this credit card.[FN 2] On March 21, 2012, Polo contacted Citibank about the card. The matter was investigated by Chip Bulin, a fraud investigator at the company. According to Bulin's testimony, an online application for the credit card was submitted on September 26, 2011, and the primary applicant was listed as "Leopold C. Lacoste." The date of birth of the applicant was listed as May 28, 1941 (Polo's date of birth), the address was 4162 Highway 56 (Linda's residence), and the social security number provided was that of Polo. The email address provided was LCLinNo1@aol.com. Because further verification was requested, two utility bills issued to "Leopold C. Lacoste" at the Highway 56 address were submitted. According to the February/March 2012 account statement, the balance on the credit card was $12,496.41.
>
> [FN 1]  Polo and Linda divorced in the early 1990s.
>
> [FN 2]  Polo and Linda have two adult sons, the defendant and William Thomas Lacoste, who goes by "Billy."
>
> Terrebonne Parish Sheriff's Office Detective James Prestenback also investigated the matter. Because a majority of the charges on the credit card were made in Houma, Detective Prestenback contacted the businesses there to determine who used the card. An employee at Gator Equipment Rentals stated that the defendant used the card to rent a concrete mixer under another person's account. The credit card was also used by the defendant to make a payment at A1 Unlimited Bail Bonds, a company in Houma. Based on this information, an arrest warrant was prepared for the defendant, and a meeting was arranged. Because the defendant did not appear for this meeting, officers prepared an affidavit and search warrant for the Highway 56 residence (Linda's residence), where the defendant was residing. When officers arrived, the defendant was outside. He was placed under arrest and transported to the police station. Officers then conducted a search of the defendant's room and bathroom in the residence.
>
> Pursuant to their search, officers found Wal-mart receipts that corresponded with charges on the Citibank statement. The last four digits of the credit card used printed on the receipts were consistent with those for the account number. Officers also located a business card bearing the name "L.C. 'Chuck' LaCoste II" and the

Highway 56 address.  The business card listed the same email address and home telephone number as that used on the credit card application.[19]

### III.  Petitioner's Claims

### A.  Ineffective Assistance of Counsel

Petitioner's first claim is that he received ineffective assistance of counsel both at trial and on appeal.  The clearly established federal law governing such claims is Strickland v. Washington, 466 U.S. 668 (1984).  Pursuant to Strickland, a petitioner must make two showings to prevail on such a claim:  (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced his defense.  Id. at 697.  A petitioner bears the burden of proof and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as

---

[19] State v. Lacoste, No. 2014 KA 0499, 2014 WL 5840239, at *1-2 (La. App. 1st Cir. Nov. 12, 2014); State Rec., Vol. 4 of 6.

7

of the time of counsel's conduct.'" <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371 (1993) (quoting <u>Strickland</u>, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel fell within a wide range of reasonable representation. <u>See</u> <u>Crockett v. McCotter</u>, 796 F.2d 787, 791 (5th Cir. 1986); <u>Mattheson v. King</u>, 751 F.2d 1432, 1441 (5th Cir. 1985).

The appropriate standard for determining prejudice varies slightly depending on whether a petitioner is challenging the actions of trial or appellate counsel. In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u> In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." <u>Crockett</u>, 796 F.2d at 793. On the other hand, to prove prejudice with respect to a claim that appellate counsel was ineffective, a petitioner must show a reasonable probability that he would have prevailed on appeal but for his counsel's deficient representation. <u>Briseno v. Cockrell</u>, 274 F.3d 204, 207 (5th Cir. 2001); <u>see also</u> <u>Smith v. Robbins</u>, 528 U.S. 259, 286 (2000). Therefore, a petitioner must demonstrate a reasonable probability that, if appellate counsel's performance had not been deficient in the manner claimed, the appellate court would have vacated or reversed the trial court judgment based on the alleged error. <u>Briseno</u>, 274 F.3d at 210.

In the post-conviction proceedings, the state courts denied petitioner's ineffective assistance of counsel claims on the merits, holding that he had not established that he was entitled to relief under <u>Strickland</u>. Because an ineffective assistance of counsel claim presents a mixed

question of law and fact, this Court must defer to the state court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). Further, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted). The Supreme Court then explained:

> Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.

> Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id.</u> at 105 (emphasis added; citations omitted). Therefore, on a habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt." <u>Woods v. Etherton</u>, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted).

Mindful of those principles and the AEDPA's deferential standards of review, the Court finds that that relief is not warranted with respect to any of petitioner's ineffective assistance of counsel claims for the following reasons.

### 1. Plea Negotiations

In his federal application, petitioner first contends that his trial counsel was ineffective during plea negotiations. In denying that claim, the state district court held:

> Defendant's assertion that trial counsel failed to engage in active plea negotiations … fails. Defendant's argument reduces to his belief that his trial lawyer should have convinced him to plead guilty in exchange for a 20 year sentence because, as a 4th felony offender, he is serving a 30 year sentence without benefit of probation or suspension. Ms. McNabb testified that she met with the prosecutor several times in an effort to obtain a favorable plea for her client. She explained that her every effort proved futile for two reasons: 1) because defendant adamantly opposed the offered 20 year sentence, and 2) because the State's offer

10

> never changed because defendant had other pending criminal charges. Even assuming that trial counsel did not inform Lacoste of every 20 year offer, defendant introduced no evidence that he would have accepted the 20 year plea offer. Post conviction relief will not be granted on this claim.[20]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning additional reasons.[21] The Louisiana Supreme Court thereafter also denied the claim, succinctly stating: "Relator fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[22] For the following reasons, this Court finds that the state court's ruling was neither contrary to nor an unreasonable application of Strickland.

In 2012, the United States Supreme Court held the Sixth Amendment's right to counsel extends to the plea-bargaining process and addressed purported violations of that right in two contexts. First, the Supreme Court held that the right can be violated if a plea bargain is offered but defense counsel fails to timely inform his client that offer. Missouri v. Frye, 566 U.S. 133 (2012). Second, the right can also be violated if defense counsel informs his client of a plea offer but then wrongly advises him to reject it. Lafler v. Cooper, 566 U.S. 156, 162 (2012).

In the instant case, it is not disputed that there was a plea bargain offered, that the offer was communicated to petitioner, and that he rejected the offer. The dispute concerns whether the offer was legally enforceable and, if it was not, whether counsel performed deficiently in failing to secure an alternative offer.

---

[20] State v. Lacoste, No. 635841, 2018 WL 9439904, at *7 (La. Dist. Ct. Jan. 10, 2018); State Rec., Vol. 5 of 6.

[21] State v. Lacoste, No. 2018 KW 0273, 2018 WL 2458855 (La. App. 1st Cir. May 29, 2018); State Rec., Vol. 6 of 6.

[22] State v. Lacoste, 264 So. 3d 436 (La. 2019); State Rec., Vol. 6 of 6.

As an initial matter, the Court notes that the underlying facts concerning the offered plea bargain remain somewhat muddled, despite the fact that an evidentiary hearing was held on this claim in state court. At that hearing, petitioner's trial counsel, Carolyn McNabb, testified that the prosecution offered not to charge petitioner as a habitual offender if he would agree to plead guilty and *actually serve* (not merely be sentenced to) *twenty years* in prison.[23] Petitioner contends that the offered plea bargain was not legally enforceable, because the charged offense carried a maximum sentence of only *ten years*. When questioned about that discrepancy at the post-conviction evidentiary hearing, McNabb explained that petitioner also faced other pending charges,[24] and the plea bargain would encompass not only the instant charge but those other charges as well, with petitioner agreeing to serve a *total* of twenty years on *all* charges.[25]

On the second day of the hearing, the state introduced a bill of information showing that petitioner was in fact also charged with a separate count of monetary instrument abuse.[26] He nevertheless now opines that he still would not have *actually served* twenty years even if that second charge is considered, because that second charge also carried a maximum sentence of *ten years*. He reasons:

> Even utilizing one count of monetary instrument abuse and running the maximum penalty consecutive to one count of identity theft, Mr. Lacoste's plea offer could not have been to serve 20 years at hard labor. If Mr. Lacoste pled guilty to the maximum penalty for each, to run consecutive, he would not have served a 20-year sentence, as he would have been eligible for goodtime diminution after 25% of each sentence.[27]

---

[23] State Rec., Vol. 6 of 6, transcript of September 26, 2017, pp. 31-32.
[24] Id. at p. 48.
[25] Id. at pp. 57-59.
[26] State Rec., Vol. 5 of 6, minute entry dated September 27, 2017; State Rec., Vol. 5 of 6, Bill of Information.
[27] Rec. Doc. 1-2, p. 14.

The state courts have not addressed petitioner's argument on the state-law issue he presents, i.e. whether the rejected twenty-year plea bargain would in fact have been legally enforceable under Louisiana law. Fortunately, this federal court need not resolve that state-law issue in order to resolve petitioner's federal ineffective assistance of counsel claim.

Even if this Court simply assumes for the purposes of this decision that petitioner's contention is accurate and the plea bargain was in fact unenforceable, the crux of his federal claim is essentially that his counsel was ineffective for failing to secure a more favorable, legally enforceable plea bargain which would guarantee him an even shorter total sentence. The flaw in that argument is that petitioner has not established that the prosecution would been receptive to offering an alternative plea bargain with terms more favorable to petitioner. On the contrary, the evidence established otherwise: McNabb emphatically testified at the post-conviction evidentiary hearing that the prosecution was adamant that a more favorable plea bargain would *not* be offered.[28] That essentially settles the issue, for it is clear that defense counsel could not force the prosecution to offer *any plea bargain at all,* much less one more to petitioner's liking. See Nguyen v. United States, 114 F.3d 699, 704 (8th Cir. 1995) ("There is no constitutional right to plea bargain."). Because defense counsel could not compel the prosecution to offer a more favorable plea bargain, her failure to do so cannot constitute ineffective assistance. See, e.g., United States v. Cronic, 466 U.S. 648, 656 n.19 (1984) ("[T]he Sixth Amendment does not require that counsel do what is impossible ...."); Franklin v. Thompson, Civ. Action No. 07-543, 2007 WL 3046642,

---

[28] State Rec., Vol. 6 of 6, transcript of September 26, 2017, pp. 31-32 and 34-36. It is hardly surprising that the prosecution was unwilling to agree to anything less than a twenty-year sentence, given that (1) a conviction could easily be obtained, given the overwhelming evidence of petitioner's guilt, and (2) petitioner faced a minimum sentence of twenty years as a fourth felony offender (a fact that petitioner himself concedes, see Rec. Doc. 1-2, p. 19).

at *11 (E.D. La. Oct. 17, 2007) ("Counsel cannot be considered ineffective for failing to accomplish the impossible.").

## 2. Introduction of "Other Crimes" Evidence

Petitioner's second claim is that his trial counsel was ineffective for failing to "meaningfully object" to the introduction of "other crimes" evidence. In denying that claim, the state district court held:

> Lacoste's [sic] next argues that trial counsel failed to meaningfully object to the introduction of L.C.E. Art. 404B evidence. This claim also fails the <u>Strickland</u> analysis. First, trial counsel filed a motion in limine to exclude the 404B evidence. Pursuant to L.C.E. Art. 404B, other crimes evidence is admissible once the State establishes an independent and relevant reason for its use at trial. <u>State v. Taylor</u>, 16-1124 (La. 12/1/16), 217 So.3d 283, 292. There are many reasons why evidence can be admitted Article 404(B), for example, to prove motive, plan, intent, opportunity, absence of mistake, and more. However, the evidence must be excluded if its sole purpose is to prove character and to show action in conformity with that character on a particular occasion. <u>See</u> <u>United States v. Ackal</u>, 706 F.2d 523, 531 (5th Cir. 1983). It is the duty of the trial court in its gatekeeping function to determine the independent relevancy of this evidence. <u>State v. Altenberger</u>, 13-2518 (La. 4/11/14), 139 So.3d 510, 515; <u>State v. Garcia</u>, 09-1578 (La. 11/16/12), 108 So.3d 1, 39. The trial court must also weigh the probative worth of the evidence against the inherently prejudicial effect of evidence of prior criminality L.C.E. Art. 403; <u>State v. Henderson</u>, 12-2422 (La. 1/4/13), 107 So.3d 566.
>
> The trial court held a <u>Prieur</u>[FN 2] hearing to determine the admissibility of the noticed prior crimes pursuant to La. Code Crim. P. art. 404B. At the hearing, defendant argued that the State failed to state the specific purpose for which it sought to introduce the other crimes. The State responded that the other crimes were relevant to show the defendant's guilty knowledge, intent, plan, scheme, pattern, and motive. The State presented evidence in support of each of the other crimes. This Court found that each of the prior crimes were relevant and showed a pattern, and allowed each of the crimes in. The State's intent to introduce these prior offenses to establish the defendant's pattern of using Polo's social security number and the identity of elderly family members and friends goes directly to rebut defenses the defendant may raise at trial that he did not use Polo's identifying information to obtain the Citibank credit card and demonstrates their independent relevancy besides merely painting defendant as a bad person. The other crimes evidence is also relevant to establish defendant's knowledge of and plan to use Polo's identifying information. His motive for using Polo's identity in order to obtain funds to cover his expenses was also established through the introduction of

the other crimes, *i.e.*, using the Citibank credit card at issue to pay for the bond expenses he incurred resulting from a previous theft charge in Terrebonne Parish. The appellate court affirmed this ruling.

> [FN 2]  State v. Prieur, 277 So. 2d 126, 130 (La. 1973).  L.C.E. Art. 404B and Prieur together require that the trial court ascertain that the evidence of other criminal acts is genuinely relevant to a contested matter other than the defendant's criminal propensity.  Care must be taken to ensure that the [s]tated purpose is legitimate and not just a pretext for placing the defendant's criminal record before the jury.  There must also be sufficient proof that the defendant is the perpetrator of the prior act(s).  Evidence that the defendant was accused or arrested is not sufficient.

> The 404B evidence showed that defendant previously committed primarily against senior or elderly victims, such as identity theft, forgery, unauthorized use of access cards, and theft under $500.00.  That evidence also established defendant's history of using the identities of elderly family members and friends in order to obtain access cards, funds, and goods.  It specifically established that he had access to and used the social security number of his father, Leopold Charles "Polo" Lacoste, to obtain goods.  Any trial objection to the same evidence would therefore have been futile is not sufficient to warrant post conviction relief.  See Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994); accord United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).  See also United States v. Morrisoa, 449 U.S. 361 (1981) (attorney error, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment).[29]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning additional reasons.[30]  The Louisiana Supreme Court thereafter also denied the claim, succinctly stating:  "Relator fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[31]  For the following reasons, this Court finds that the state court's ruling was neither contrary to nor an unreasonable application of Strickland.

---

[29] State v. Lacoste, No. 635841, 2018 WL 9439904, at *5-6 (La. Dist. Ct. Jan. 10, 2018); State Rec., Vol. 5 of 6.
[30] State v. Lacoste, No. 2018 KW 0273, 2018 WL 2458855 (La. App. 1st Cir. May 29, 2018); State Rec., Vol. 6 of 6.
[31] State v. Lacoste, 264 So. 3d 436 (La. 2019); State Rec., Vol. 6 of 6.

As can be inferred from his careful use of the phrase "meaningfully object," petitioner does not – and, indeed, could not legitimately – contend that McNabb failed to object to the "other crimes" evidence; she filed a motion for a <u>Prieur</u> hearing to challenge the admissibility of that evidence,[32] and a hearing on that motion was held prior to trial.[33] Rather, he instead argues: "She made a blanket objection to the admissibility of the evidence to each of the eight other crimes but failed to lodge any *persuasive* argument."[34]

As an initial matter, the Court notes that petitioner contends that the clearly established federal law governing this claim is <u>United States v. Cronic</u>, 466 U.S. 648 (1984), *not* <u>Strickland</u>. The Court rejects that contention for the following reasons.

Regarding <u>Cronic</u>, the United States Supreme Court has explained:

> In <u>Cronic</u>, we considered whether the Court of Appeals was correct in reversing a defendant's conviction under the Sixth Amendment without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial. We determined that the court had erred and remanded to allow the claim to be considered under <u>Strickland</u>'s test. In the course of deciding this question, we identified three situations implicating the right to counsel that involved circumstances so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.
>
> First and most obvious was the complete denial of counsel. A trial would be presumptively unfair, we said, where the accused is denied the presence of counsel at a critical stage, a phrase … used … to denote a step of a criminal proceeding, such as arraignment, that held significant consequences for the accused. Second, we posited that a similar presumption was warranted if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing. Finally, we said that … where counsel is called upon to render assistance under circumstances where competent counsel very likely could not, the defendant need not show that the proceedings were affected.

<u>Bell v. Cone</u>, 535 U.S. 685 (2002) (citations, footnote, quotation marks, and brackets omitted).

---

[32] State Rec., Vol. 2 of 6, Defendant's Motion for Pre-Trial Hearing.
[33] State Rec., Vol. 3 of 6, transcript of December 10, 2012, pp. 23-79.
[34] Rec. Doc. 1-2, p. 17 (emphasis added).

Here, petitioner argues that the second situation applies, because "Mr. Lacoste's attorney completely failed to meaningfully test the State's presentation of other crimes evidence" when "[t]he State was allowed to unilaterally introduce other crimes evidence in a sham 'hearing' that occurred moments before Mr. Lacoste's jury trial began."[35] However, again, that exception applies only if defense counsel "*entirely* fails to subject the prosecution's case to meaningful adversarial testing." <u>Cronic</u>, 466 U.S. at 659 (emphasis added). In other words, defense counsel's "failure must be *complete*." <u>Bell</u>, 535 U.S. at 696-97 (emphasis added). In the instant case, the record reflects that an *extensive* <u>Prieur</u> hearing was held in this case, during which the prosecutor was required to explain why the "other crimes" evidence was admissible, with defense counsel *continuously and vigorously* attempting to undermine the prosecutor's reasoning.[36] Any suggestion that defense counsel *completely* failed to challenge the admissibility of the "other crimes" evidence and to mount a defense in this case is not only unfounded, it borders on ludicrous. Therefore, <u>Strickland</u>, *not* <u>Cronic</u>, is the clearly established federal law governing this claim.

Further, as previously explained, to prevail under <u>Strickland</u>, a petitioner must show both deficient performance and prejudice. Here, it would be difficult to say that defense counsel performed deficiently in challenging the "other crimes" evidence. Nevertheless, even if that prong of the analysis could somehow be met, petitioner clearly cannot show that prejudice resulted. As previously explained, in order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result

---

[35] <u>Id.</u> at p. 18.
[36] State Rec., Vol. 3 of 6, transcript of December 10, 2012, pp. 23-79.

of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. Petitioner cannot make

that showing for the following reasons.

The state court record establishes that the admissibility of the "other crimes" evidence was

exhaustively considered prior to trial and on direct appeal, and the state courts determined that the

evidence was admissible under state law. For example, on direct appeal, the Louisiana First Circuit

Court of Appeal held:

> Generally, evidence of other crimes committed by the defendant is inadmissible due to the "substantial risk of grave prejudice to the defendant." To admit "other crimes" evidence, the State must establish that there is an independent and relevant reason for doing so, *i.e.*, to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act. Evidence of other crimes, however, is not admissible simply to prove the bad character of the accused. Further, the other crimes evidence must tend to prove a material fact genuinely at issue and the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. <u>State v. Tilley</u>, 99-0569, p. 18 (La. 7/6/00), 767 So.2d 6, 22, <u>cert. denied</u>, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001). Ultimately, questions regarding the admissibility of evidence are within the discretion of the district court and should not be disturbed absent a clear abuse of that discretion. <u>State v. Mosby</u>, 595 So.2d 1135, 1139 (La. 1992).
>
> The procedure to be used when the State intends to offer evidence of other criminal offenses was formerly controlled by <u>Prieur</u>.[FN 3] Under <u>Prieur</u>, the State was required to prove by clear and convincing evidence that the defendant committed the other crimes. <u>Prieur</u>, 277 So.2d at 129. However, 1994 La. Acts 3d Ex.Sess. No. 51 added La.Code Evid. Art. 1104 and amended Article 404B. Article 1104 provides that the burden of proof in pretrial <u>Prieur</u> hearings, "shall be identical to the burden of proof required by Federal Rules of Evidence Article IV, Rule 404." The burden of proof required by Federal Rules of Evidence Article IV, Rule 404, is satisfied upon a showing of sufficient evidence to support a finding by the jury that the defendant committed the other crime, wrong, or act. <u>See</u> <u>Huddleston v. U.S.</u>, 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). The Louisiana Supreme Court has yet to address the issue of the burden of proof required for the admission of other crimes evidence in light of the repeal of La.Code Evid. Art. 1103 and the addition of Article 1104. However, numerous Louisiana appellate courts, including this court, have held that burden of proof to now be less than "clear and convincing." <u>State v. Millien</u>, 2002-1006, p. 11 (La.App. 1 Cir. 2/14/03), 845 So.2d 506, 514; <u>see also</u> <u>States v. Williams</u>, 99-2576, p. 7 n.4 (La.App. 1 Cir. 9/22/00), 769 So.2d 730, 734 n.4.

[FN 3]  <u>See</u> <u>State v. Prieur</u>, 277 So.2d 126 (La. 1973).

Prior to trial, the State filed notice of intent to use evidence of other crimes. The defendant argues that the State's notice was inadequate because it failed to set forth the purpose for which the other crimes evidence was being offered. The notice provided by the State listed the nature of the other crimes, against whom they occurred, and when they occurred. The defendant was charged with identity theft of an individual over the age of sixty. His defense at trial was that he was not the person who applied for the Citibank credit card. The other crimes evidence involved charges of identity theft, forgery, unauthorized use of access cards and theft under $500.00. A majority of the victims were elderly individuals. The other crimes evidence established that the defendant used the identities of close, elderly family and friends in order to obtain access cards, funds, and goods; and it specifically established that he used the social security number of the victim in order to obtain goods. It is clear that the State was notifying the defendant that it would use this other crimes evidence to demonstrate the defendant's knowledge, intent, plan, and motive to use the victim's social security number and other identifying information in order to obtain the Citibank credit card. "The rules of <u>Prieur</u> were not meant to be used as additional, technical procedures sacramental to a valid conviction." <u>State v. Lee</u>, 25,917, p. 7 (La. App. 2 Cir. 5/4/94), 637 So.2d 656, 662, <u>writ denied</u>, 94-1451 (La. 10/7/94), 644 So.2d 631, (quoting <u>State v. Banks</u>, 307 S.2d 594, 597 (La. 1975)). Substantial compliance with <u>Prieur</u> is all that required. <u>State v. McDermitt</u>, 406 So.2d 195, 201 (La. 1981). The State substantially complied with <u>Prieur</u> because the exceptions under which the other crimes evidence would be admitted at trial were clear. Moreover, at the <u>Prieur</u> hearing, the State clearly explained the exceptions under which the other crimes were being admitted, thus putting the defendant on notice before trial.

The court held a <u>Prieur</u> hearing to determine the admissibility of these other crimes pursuant to La.Code Crim. P. art. 404B(1). At the hearing, the defendant argued that the State failed to state the specific purpose for which it sought to introduce the other crimes. The State responded that the other crimes were relevant to show the defendant's guilty knowledge, intent, plan, scheme, pattern, and motive. The State presented evidence in support of each of the other crimes as follows:

### *2001 Identity Theft*

The State introduced the bill of information, minute entry, and "Plea of Guilty" form, indicating that the defendant pled guilty to identity theft under Orleans Criminal District Court docket number 445,985 on April 23, 2004. The State also introduced the testimony of Polo, who stated the defendant used his social security number "time and time again," beginning in 2001, when the defendant wrote counter checks on his checking account in connection with this charge.

### 2002 Forgery

In connection with the defendant's forgery charges for stealing his grandfather's identity, in an attempt to obtain a Home Depot credit card in Jefferson Parish, in 2002, the State introduced the bill of information, minute entry, and police report, detailing the incident. The officer who authored the report testified at trial. The State also introduced the "Waiver of Constitutional Rights Plea of Guilty," indicating that the defendant pled guilty on February 19, 2004, under 24th Judicial District Court ("JDC"), Jefferson Parish docket number 02-5152.

### 2002 Forgery & 2003 Identity Theft

In connection with the defendant's September 2002 forgery of three of Linda's checks, the State introduced the bill of information, minute entry, and police report. The officer who authored the police report testified at trial. Also introduced were affidavits by Linda, stating that the signatures on the checks made payable to "L.C. Lacoste" were forgeries; copies of the checks; a search warrant for the defendant's vehicle; and a list of items found in the defendant's vehicle, including Linda's checkbook. The State included the transcript from the February 28, 2005 hearing where the defendant was advised of his Boykin[FN 4] rights, and the defendant pled guilty to three counts of forgery under 32nd JDC, Terrebonne Parish docket number 424,462, on May 25, 2005. Pursuant to his plea agreement, the State dismissed another charge of identity theft. The dismissed charges were related to identity theft of Polo in Terrebonne Parish in 2003. Polo testified that the defendant used his social security number to purchase a Jeep, pay utility bills, and to purchase other items. Because of the plea agreement, there was no conviction. However, the State argued that the charges were relevant to show that the defendant used Polo's name and social security number to obtain credit. In addition to Polo's testimony, the State introduced the bill of information, arrest report, copies of telephone bills, and a witness statement form and identity theft affidavit filled out by Polo. The officer who authored the report testified at trail.

[FN 4] See Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

### 2011 Theft under $500.00

In connection with the defendant's charges for theft under $500.00, for forging Linda's name and cashing her checks at Captain Allen's Bait and Tackle, the State introduced a police report, bill of information, and minute entry. The owner of Captain Allen's testified as to the details at trial. On March 20, 2012, the defendant pled guilty to theft under $500.00, under 32nd JDC, Terrebonne Parish docket number 602,075.

The State argued that it was showing a pattern of the defendant's behavior for over a ten-year period in stealing the identity of elderly people, and explained that the next two charges were an integral part of the instant case.

*2011 Identity Theft*

When the defendant was arrested for identity theft in connection with the use of a credit card belonging to another, in Terrebonne Parish, his bond was set at $150,000.00. That charge was later amended to theft under $500.00, and the defendant pled guilty on March 20, 2012, under 32nd JDC, Terrebonne Parish docket number 618,347. Fanguy at A1 Unlimited posted bail for the defendant. When the defendant was released from jail, he wrote a check in payment of his bail obligation to Fanguy in the amount of $5,000.00. The check was returned for nonsufficient funds, and the defendant used the credit card at issue in order to pay the debt. Fanguy did not press criminal charges. Defense counsel stated that she did not consider those offenses as being covered under "other bad acts or prior acts." She indicated that she did not object to those two offenses for purposes of the Article 404B notice, but that she was not waiving any objection to potential admissibility problems at trial. The district court agreed that defense counsel could still raise the objection during trial. It then opined that ruling on those two offenses was "kind of a moot, but I'm going to let it in. Obviously, I don't think I have a choice."

*2012 Unauthorized Use of an Access Card*

The last "other crime" that the State sought to introduce involved the defendant's use of Dr. George Lyons's credit card in 2012. Although the doctor gave his card to the defendant to purchase a hot water heater for his daughter (whom the defendant was doing repair work for), when the bill came in, there were over $3,500.00 worth of unauthorized charges. In support of this charge, the State introduced the police report and a copy of the credit card statement. However, testimony and evidence established that the victim of the offense chose not to press charges.

Convinced by the State's arguments, the district court allowed each of the crimes in, finding that they were relevant and showed a pattern, the State's intent to introduce these prior offenses to establish the defendant's pattern of using Polo's social security number and the identity of elderly family members and friends goes directly to rebut defenses the defendant may raise at trial that he did not use Polo's identifying information to obtain the Citibank credit card and demonstrates their independent relevancy besides merely painting the defendant as a bad person. The other crimes evidence is also relevant to establish the defendant's knowledge of and plan to use Polo's identifying information. His motive for using Polo's identity in order to obtain funds to cover his expenses was also established through the introduction of the other crimes, *i.e.*, using the Citibank credit card at issue to pay for the bond expenses he incurred resulting from his theft charge in Terrebonne Parish.

Based on our review of the records, we find that the district court did not err or abuse its discretion in allowing the introduction of the other crimes evidence presented by the State. While the introduction of this other crimes evidence was certainly prejudicial, the probative value of the evidence – to show the defendant's

knowledge of Polo's identifying information and motive for applying for the Citibank credit card – outweighed any prejudice.[37]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[38]

Because the state courts clearly held that the "other crimes" evidence was admissible in this case *as a matter of state evidentiary law*, this federal habeas court may not second-guess the accuracy of that ruling.  See Charles v. Thaler, 629 F.3d 494, 500-01 (5th Cir. 2011) ("Because the state determined that [the] testimony [at issue] was permissible … under state evidentiary law …, a federal habeas court may not conclude otherwise. Under § 2254, federal habeas courts sit to review state court misapplications of *federal* law.  A federal court lacks authority to rule that a state court incorrectly interpreted its own law.  When, as here, a state court's legal conclusions are affirmed by the highest court in that state, those conclusions *are* state law." (citations omitted)); Bridges v. Tanner, Civ. Action No. 17-1925, 2019 WL 3774446, at *7 (E.D. La. Aug. 12, 2019) ("State courts are the final arbiters of state law, and this Court may not question the Louisiana Supreme Court's interpretation of the Louisiana Code of Evidence." (footnote omitted)).

Therefore, bound by the state court ruling on this issue of state evidentiary law, this Court cannot find that any prejudice resulted because, obviously, there is no reasonable probability that the evidence would have been found to be inadmissible and result of this proceeding would have been different if only defense counsel had argued the issue more persuasively.  Accordingly, this claim necessarily fails.

---

[37] State v. Lacoste, No. 2014 KA 0499, 2014 WL 5840239, at *5-8 (La. App. 1st Cir. Nov. 12, 2014); State Rec., Vol. 4 of 6
[38] State v. Lacoste, 184 So. 3d 22 (La. 2015); State Rec., Vol. 4 of 6.

### 3.  Limiting Instruction

Petitioner's  third  claim  is  that  his  trial  counsel  was  ineffective  for  failing  to  request  that  a limiting  instruction  be  given  concerning  the "other crimes"  evidence.  In  denying  that  claim,  the state district  court held:

> [T]he  parties  *stipulated*  to  the  other  crimes  defendant  committed  and  to  which  he knowingly  and  voluntarily  pled  guilty.[FN 3]  Furthermore,  the  trial  court  cautioned the  jury  more  than  once  that  Lacoste  was  not  on  trial  for  prior  offenses  and  could not  be  convicted  based  solely  on  any  other  crime  he  may  have  committed.  Also,  as the  appellate  court  discussed  in  detail,  there  was  more  than  sufficient  evidence  to support  the  jury's  guilty  verdict  even  without  consideration  of  defendant's  prior offenses.
>
>> [FN 3]  The parties stipulated that the defendant is the same Leopold Charles Lacoste, II, who pled guilty to (1) identity theft in Orleans Parish, docket number 445,985,  on April 23, 2004 (in connection with the defendant writing counter checks on Polo's checking account); (2) forgery in Jefferson Parish, docket number 025,152, on February 19, 2004 (in connection with an incident at Home Depot); (3) forgery (3 counts) in Terrebonne parish, docket number 424,462, on May 23, 2005 (in connection with forging his mother's checks on a closed account); and (4) theft under $500.00  in  Terrebonne  Parish, docket number 602,075,  on March 20, 2012 (in connection with forging his mother's checks at Captain Allen's Bait and Tackle).  Defendant has never suggested or even remotely contended that any of his prior guilty pleas was constitutionally infirm.
>
> The  parties'  stipulation  that  Polo  was  70 years  old  at  the  time  of  the  offense and  that  defendant  used  the  Citibank  credit  card  at  issue  to  obtain  goods  and services  in  excess  of  $1000,  Polo's  testimony,  and  the  weight  of  other  evidence presented  at  trial  are  ample  support  for  the  jury's  guilty  verdict.  The  State  presented evidence  that  the  Citibank  card  was  obtained  using  Polo's  social  security  number and  birthday.  The  remaining  information,  including  the  email  address,  home address,  and  home  telephone  number  were  those  of  defendant.  The  State  put  forth evidence  that  defendant's  email  address  was  listed  on  the  original  online application.  Citibank  used  that  address  to  correspond  with  the  applicant.  Citibank requested  additional  information  and  received  documents  in  response  to  the  email it  sent  to  that  address.  There  was  no  testimony  that  anyone  other  than  defendant had  access  to  his  email  account.  Defendant's  mother,  Linda  Thibodeaux,  testified that  during  the  last  week  of  September 2011,  defendant  was  living  in  her  home  and that  his  brother,  Billy,  was "in  and  out"  but  did  not  live  with  them.  Thus,  there  was little  chance  that  the  jury  would  confuse  the  facts  of  the  defendant's  prior  conduct with  the  present  offense.  Trial  counsel's  failure  to  request  a  more  detailed  jury instruction  and/or  limiting  instruction  on  the 404B  evidence,  therefore,  is  harmless,

especially in light of the joint stipulation detailing Lacoste's prior crimes. Post conviction relief will not be granted on this claim.[39]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning additional reasons.[40] The Louisiana Supreme Court thereafter also denied the claims, succinctly stating: "Relator fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[41] For the following reasons, this Court finds that the state court's ruling was neither contrary to nor an unreasonable application of Strickland.

As an initial matter, it must be noted that although defense counsel did not request a special limiting instruction on this issue, the judge's jury instructions nevertheless included the following general admonition: "Remember that the defendant is on trial only for the offense charged. You may not find him guilty of this offense merely because he may have committed another offense."[42]

Moreover, in any event, even assuming that counsel's failure to request a more specific limiting instruction in this instance constituted deficient performance, the Court again finds that petitioner's claim fails on the prejudice prong of the Strickland analysis. As the United States Supreme Court has explained: "To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. In assessing prejudice, courts must consider the totality of the evidence before the judge or jury." Berghuis v. Thompkins, 560 U.S. 370, 389 (2010) (citation omitted); accord Thomas v. Vannoy, 651 F. App'x 298, 301 (5th Cir. 2016) (noting that the prejudice

---

[39] State v. Lacoste, No. 635841, 2018 WL 9439904, at *6 (La. Dist. Ct. Jan. 10, 2018); State Rec., Vol. 5 of 6.
[40] State v. Lacoste, No. 2018 KW 0273, 2018 WL 2458855 (La. App. 1st Cir. May 29, 2018); State Rec., Vol. 6 of 6.
[41] State v. Lacoste, 264 So. 3d 436 (La. 2019); State Rec., Vol. 6 of 6.
[42] State Rec., Vol. 3 of 6, transcript of December 13, 2012, p. 125.

"inquiry necessarily examines the strength of the other evidence in the case weighed against the egregiousness of counsel's error"). Accordingly, if "it was not reasonably likely that the instruction would have made any difference in light of all the other evidence of guilt," then there is no basis for finding that <u>Strickland</u> prejudice resulted from counsel's failure to request the limiting instruction. <u>Thompkins</u>, 560 U.S. at 390.

Here, considering the totality and strength of the evidence separate and apart from the "other crimes" evidence, as well as the fact that the trial court gave a general limiting instruction in the jury charges, the Court finds that it is not reasonably likely that a more specific limiting instruction would have changed the outcome of the trial. Therefore, it cannot be reasonably said that counsel's failure to request a more specific limiting instruction resulted in any prejudice.

### 4. Sentence

Petitioner's fourth claim is that his sentencing counsel was ineffective for failing to object to the sentence. In denying that claim, the state district court held:

> Defendant claims that post-trial/sentencing counsel, Michael Billiot, was ineffective in not requesting a presentence investigation, or moving for a separate sentencing hearing, or presenting witnesses or mitigation evidence at the habitual offender hearing, or objecting object to his enhanced habitual offender sentence. Mr. Billiot was under subpoena but not called at the post-conviction relief evidentiary hearing. His motives are unknown but presumed to be within the wide range of reasonable professional assistance. Defendant has not overcome this presumption. Defendant has not established a reasonable probability [ t h a t ] the outcome of the habitual offender proceeding would have been different if counsel had taken any of the measures enumerated above. Post-conviction relief will not be granted on this claim.[43]

---

[43] <u>State v. Lacoste</u>, No. 635841, 2018 WL 9439904, at *7 (La. Dist. Ct. Jan. 10, 2018); State Rec., Vol. 5 of 6.

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning additional reasons.[44] The Louisiana Supreme Court thereafter also denied the claims, succinctly stating: "Relator fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[45] For the following reasons, this Court finds that the state court's ruling was neither contrary to nor an unreasonable application of Strickland.

Once again, even assuming that counsel's failure to object to the sentence in this case constituted deficient performance, the Court finds that petitioner's claim fails on the prejudice prong of the Strickland analysis for the following reasons.

The record reflects that the trial court carefully considered petitioner's sentence and gave detailed written reasons to support the sentence imposed, stating:

> The sentence range for the crime of identity theft of more than $1000 from a person aged 60 or older, is 3 to 10 years' incarceration with or without hard labor and a fine of not more than $10,000, or both. La. R.S. § 14:62. The habitual offender law dictates that a fourth felony habitual offender be imprisoned at hard labor for a determinate term from 20 years to life imprisonment, without benefit of probation or suspension of sentence. La. R.S. § 15:529.1A(1)(c)(ii) and G.
> The mandatory minimum sentence imposed by the habitual offender statute is presumptively constitutional and should be accorded great deference by the courts. State v. Johnson, 1997-1906 (La. 3/4/98), 709 So.2d 672. Although courts have the power to declare a mandatory sentence excessive under Article I, § 20 of the Louisiana Constitution, this power should only be exercised in rare cases and only when the court finds there is clear and convincing evidence that would rebut the presumption of constitutionality. Id. The burden is on the defendant to rebut the presumption that a mandatory minimum sentence is constitutional. Id. To do so, the defendant must clearly and convincingly show that he is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. Id.

---

[44] State v. Lacoste, No. 2018 KW 0273, 2018 WL 2458855 (La. App. 1st Cir. May 29, 2018); State Rec., Vol. 6 of 6.
[45] State v. Lacoste, 264 So. 3d 436 (La. 2019); State Rec., Vol. 6 of 6.

This 47 year-old defendant failed to carry his burden of proof under Johnson, *supra*, because he did not show any unusual circumstance that would support such a rare downward departure. Although he is relatively young, Mr. Lacoste's criminal record includes multiple felony convictions, primarily involving theft of one kind or another, over an 8 year period. Although his crimes appear at first blush to be non-violent, they all involve an abuse of trust. To some, such crimes, especially when they involve seniors or other special victims, are the greatest offenses possible. Mr. Lacoste committed such offenses repeatedly. Despite his experience with our criminal justice system, Mr. Lacoste continues to disregard our criminal laws which exist for the protection of our citizens. Time and time again the justice system has afforded him leniency and an opportunity to better himself. He has learned nothing. He instead continues to lead a parasitic lifestyle and betrays the trust of those who care about him. He is a blight upon society and a plague upon his family and family friends. He has exhibited no remorse, shame, or indication of guilt at any time during this criminal proceeding. He is fortunate indeed that his mother had remained steadfastly at his side.

The Court is convinced that the statutory minimum sentence is not a harsh enough punishment for this defendant under these circumstances. Mr. Lacoste is, in fact, a career criminal. His crimes are offensive because they occur under a shelter of trust, not in the open. He has proven himself to be a danger to society and, on this occasion, he victimized a victim afforded greater protection under our criminal laws. A lesser sentence will not satisfy the goals of the habitual offender statute, to deter and punish recidivism, and would be inappropriate.

Accordingly, the Court has sentenced Leopold Charles Lacoste, II, as a *fourth* felony habitual offender to be to be imprisoned for 30 YEARS AT HARD LABOR without benefit of probation or suspension of sentence, with credit for time served under this the habitual offender bill and the underlying charge of identity theft of $1000 or more from a person aged 60 or older (docket number 635841), said sentence to run CONSECUTIVELY to any other sentence the defendant is presently serving.[46]

In light of the trial court's emphatic reasons for imposing the thirty-year sentence, it simply cannot be said that there is a reasonable probability that a lesser sentence would have been imposed – or that the thirty-year sentence would have been vacated on appeal – if only counsel had objected or filed a motion for reconsideration of the sentence. Therefore, petitioner's fourth contention should also be rejected.

---

[46] State Rec., Vol. 3 of 6, Amended Reasons for Sentence.

### 5.  Appeal

Petitioner's fifth claim is that his appellate counsel was ineffective for failing to challenge the sentence on appeal.  In denying that claim, the state district court held:

> Defendant's assertion that appellate counsel, Mark Plaisance, was ineffective for not objecting on appeal to the enhanced 30 year sentence, does not warrant post conviction relief.  Mr. Plaisance testified that, based on his many years of appellate practice, he did not object to the habitual offender sentence on appeal because a motion to reconsider sentence was not filed with the trial court.  In this regard, La. C.Cr.P. art. 881.1 E provides:  "Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the State or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review."  Appellate counsel's decision is presumed to be within the wide range of reasonableness.  Defendant has not overcome this presumption.  Defendant has not established a reasonable probability [that] the outcome of the appeal would have been different if counsel had taken any of the measures enumerated above.  Post-conviction relief will not be granted on this claim.[47]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning additional reasons.[48]  The Louisiana Supreme Court thereafter also denied the claims, succinctly stating:  "Relator fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[49]  For the following reasons, this Court finds that the state court's ruling was neither contrary to nor an unreasonable application of Strickland.

In assessing this claim, it must be remembered that counsel "is not obligated to urge on appeal every nonfrivolous issue that might be raised (not even those requested by defendant)." West v. Johnson, 92 F.3d 1385, 1396 (5th Cir. 1996).  Rather, "[e]xperienced advocates since time

---

[47] State v. Lacoste, No. 635841, 2018 WL 9439904, at *7 (La. Dist. Ct. Jan. 10, 2018); State Rec., Vol. 5 of 6.
[48] State v. Lacoste, No. 2018 KW 0273, 2018 WL 2458855 (La. App. 1st Cir. May 29, 2018); State Rec., Vol. 6 of 6.
[49] State v. Lacoste, 264 So. 3d 436 (La. 2019); State Rec., Vol. 6 of 6.

beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Jones v. Barnes, 463 U.S. 745, 751-52 (1983). Far from evidencing ineffectiveness, an appellant counsel's restraint often benefits his client because "a brief that raises every colorable issue runs the risk of burying good arguments ... in a verbal mound made up of strong and weak contentions." Id. at 753. As a result, the applicable test to be applied in assessing such a claim is whether the issue ignored by appellate counsel was "clearly stronger" than the issues actually presented on appeal. See, e.g., Diaz v. Quarterman, 228 F. App'x 417, 427 (5th Cir. 2007); accord Smith v. Robbins, 528 U.S. 259, 288 (2000).

In the instant case, appellate counsel raised four assignments of error on direct appeal: (1) there was insufficient evidence to support petitioner's conviction; (2) the prosecution's notice of intent to use other crimes evidence was inadequate, the prosecution introduced other crimes at trial that it failed to prove at the pretrial hearing, and the district court erred by failing to instruct the jury on the limited use of the other crimes evidence; (3) the trial court erred in excluding hearsay testimony that petitioner's brother planned to frame the petitioner, thereby infringing on his constitutional right to present a defense; and (4) the prosecution failed to prove that petitioner committed the predicate offenses used to support his habitual offender conviction. Although those claims were ultimately found to have no merit, it cannot be said that an excessive sentence claim would have been any stronger. That is especially true in light of the fact that, at best, any such claim would have been limited to a bare challenge of the sentence as *constitutionally* excessive because no motion for reconsideration of sentence was filed. State v. Duncan, 109 So. 3d 921, 923 (La. App. 2d Cir. 2013) ("[W]hen a defendant files no motion to reconsider sentence in the

lower court, appellate review is limited to … an analysis of the sentence for constitutional excessiveness.").

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He clearly has not made that showing in the instant case. Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

## B. Prosecutorial Misconduct

Lastly, petitioner claims that his right to due process was violated because his criminal proceedings were tainted by prosecutorial misconduct. In the post-conviction proceedings, the state district court denied that claim on the merits, holding:

> Lacoste alleges that he was denied a fair trial because the prosecutor, Jason Lyons, failed to disclose his alleged prior employment by and/or representation of defendant's father, the victim in this case. Post conviction relief will not be granted on this claim. To date, defendant has submitted no admissible evidence to support this claim. At her client's urging, defendant's trial lawyer, Carolyn McNabb, filed a motion to disqualify Mr. Lyons. At the hearing on December 10, 2012, Mr. Lyons testified under oath that "I have never performed work for Mr. Polo Lacoste, the victim in this matter, either directly to him or to any company that he was affiliated with." He further testified that
>
> > "I performed no legal work for Mr. Elwin Duplantis (defendant's maternal grandfather) or Duplantis Truck Lines at any time while he owned Duplantis Truck Lines … But I have never had any dealings with Mr. (Polo) Lacoste, either directly or through his affiliation with the truck line or any of the subsidiary companies. I don't think I've ever even notarized a document for Mr. (Polo) Lacoste."
>
> He further testified that he performed no legal services for Duplantis Truck Lines while Mr. Polo Lacoste was president, and received no checks signed by Mr. Polo Lacoste. Faced with this testimony, Lacoste's trial counsel withdrew the motion.

> Due process and the canons of professional ethics or standards are not coextensive." <u>State v. Ortiz</u>, 2011-2799 (La. 1/29/13), 110 So.3d 1029, 1034. Rather, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. The aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." <u>Id.</u> (citations and internal quotation marks omitted). The court reviewed the trial transcript and finds that the State had no undue advantage over the defendant. In fact, the defendant was given every opportunity to conduct discovery, file and argue motions, negotiate a plea with the State in lieu of trial, present a defense or alternate theory at trial, cross-examine the State's witnesses, call witnesses on his behalf, and present opening Statements and closing arguments.[50]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning additional reasons.[51] The Louisiana Supreme Court thereafter also denied the claims, simply stating: "[R]elator fail[ed] to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2."[52]

The state court record reflects that, prior to trial, defense counsel filed a motion to recuse Assistant District Attorney Jason Lyons on the basis that he had "worked for the alleged victim Leopold C. Lacoste for many years as his employee and as his attorney."[53] At the motion hearing held on December 10, 2012, petitioner's counsel, Carolyn McNabb, explained:

> Mr. Lacoste filed a motion to recuse Mr. Lyons because he says that for years Mr. Lyons had a financial relationship with the victim in this case. The victim is Mr. Lacoste's father who is Leopold C. Lacoste. As I understand it from my client Mr. Lyons worked for Mr. Lacoste for some period of years. It was in a relationship of – I think Mr. Lyons represented the company that Mr. Lacoste was working for, but this Mr. Lacoste believes that the victim his father and Mr. Lyons, you know, had a working relationship with Mr. Lacoste, paid Mr. Lyons for the work that Mr. Lyons did for them.
>
>           ....

---

[50] <u>State v. Lacoste</u>, No. 635841, 2018 WL 9439904, at *3 (La. Dist. Ct. Jan. 10, 2018); State Rec., Vol. 5 of 6.
[51] <u>State v. Lacoste</u>, No. 2018 KW 0273, 2018 WL 2458855 (La. App. 1st Cir. May 29, 2018); State Rec., Vol. 6 of 6.
[52] <u>State v. Lacoste</u>, 264 So. 3d 436 (La. 2019); State Rec., Vol. 6 of 6.
[53] State Rec., Vol. 2 of 6, Defendant's Motion to Recuse the Prosecutor.

He says the relationship existed for some between ten and 12 years while his father worked at the company. In the 80s.[54]

McNabb further explained that petitioner "believes the relationship may have terminated in the mid 90s."[55]

McNabb then called Lyons to the stand to testify regarding that alleged employment relationship, asking him if he was "ever an employee of, or did you ever provided [sic] legal services for Duplantis Truck Line."[56] Lyons testified:

Ever? Yes, since about 2000 I have been corporate counsel for Duplantis Truck Line and its owners, who since that time were Philip Fanguy, who passed away, and his wife Myra. *I have never performed work for Mr. Polo Lacoste the victim in this matter, either directly to him or to any company that he was affiliated with.*

....

… I started doing Duplantis Truck Line's work approximately 2000, and I could lay out a little bit of chronological history if you want. Duplantis Truck Line was originally owned by Mr. Elwin Duplantis, the defendant's – Mr. Elwin Duplantis is the defendant's grandfather, was Mr. Polo Lacoste's father-in-law. Mr. Polo Lacoste's wife at that time was named Linda. Mr. Elwin Duplantis had three daughters, Linda, June, and Myra. Myra married Philip Fanguy. *I performed no legal work for Mr. Duplantis or Duplantis Truck Lines at any time while he owned Duplantis Truck Lines.* In approximately the late 90s Mr. Duplantis' wife passed away, and there were two subsidiary corporations I have come to learn that I think the daughters owned interest in, and perhaps the three son-in-laws may have owned an interest in one or both of them. After Mrs. Duplantis passed away and Mr. Duplantis became a bit elderly in age, the business was transferred, I'm not quite sure, but ultimately Mr. Philip and Miss Myra wound up with one hundred percent ownership interest in Duplantis Truck Line. I've had a long-standing relationship with those two and their children, and at that point or subsequently to them acquiring ownership in Duplantis Truck Line I had done some legal work for them personally, and at that point I started with Mr. Philip doing the legal work for the truck line, but *never have I had any dealings with Mr. Lacoste, either directly or through his affiliation with the truck line or any of the subsidiary companies.* I don't think I've ever even notarized a document for Mr. Lacoste.[57]

---

[54] State Rec., Vol. 3 of 6, transcript of December 10, 2012, p. 5.
[55] Id. at p. 6.
[56] Id. at p. 13.
[57] Id. at pp. 13-15.

Lyons later also testified that he never performed any legal services for the truck line when Mr. Lacoste was the president and never received any payments from him, explaining, "Mr. Lacoste was long gone from Duplantis Truck Line when I started performing legal services for the truck line."[58] At that point, defense counsel withdrew the motion to recuse.[59]

In this federal habeas corpus application, petitioner argues that Lyons committed perjury during that motion hearing and, as a result of that deception, petitioner's right to due process was violated. In support of that argument, he produced the police report concerning petitioner's arrest for attempting to steal his grandfather's identity in 2002 by fraudulently obtaining a Home Depot credit card. That police report stated:

> Scott Schumacher a fraud investigator for Monogram Bank, advised that, Mr. Elwin Duplantis had his attorney (Jason Lyons …) notify the fraud department, of an identity theft, in which Mr. Duplantis, had someone attempting to open accounts under his name, without permission. This problem has been occurring since August 2001, with the company Brooks Bros., where Mr. Duplantis has been receiving several bills.[60]

Petitioner also produced letters from Lyons to Equifax and Brooks Brothers dated October 19, 2001, in which he stated that he was representing Mr. Duplantis in connection with the fraudulently obtained credit cards.[61]

That evidence simply does not prove that Lyons committed perjury. The motion to recuse alleged that Lyons worked for many years as an attorney for *Polo Lacoste*, petitioner's *father*, and Lyons testified at the motion hearing that he had never worked for Polo Lacoste. Petitioner's evidence does not prove otherwise. Further, the questioning at the motion hearing focused on

---

[58] Id. at pp. 15-16.
[59] Id. at p. 16.
[60] Rec. Doc. 1-4, p. 8.
[61] Id. at pp. 13-14.

Lyons' work as counsel for *Duplantis Truck Line*.  Lyons testified that, although he performed

legal work for Duplantis Truck Line, that work was performed when the company was owned by

the Fanguys, *after Polo Lacoste and/or Elwin Duplantis no longer ran the company.*  Again,

petitioner's evidence in no way proves that testimony was untrue.  At best, petitioner's evidence

showed only that Lyons represented *Elwin Duplantis,* petitioner's *grandfather,* on a *personal*

*matter unrelated to the trucking company* in 2001, which is a separate issue raised in neither the

motion to recuse nor at the motion hearing.  Therefore, any suggestion that Lyons committed

perjury in this matter is inaccurate.

    Further, if petitioner is suggesting that Lyons' representation of Elwin Duplantis in 2001

was sufficient to require Lyons' recusal in this matter, that contention also has no merit for the

following reasons.

    It is clear that a prosecutor's interest "in a criminal prosecution is not that [he] shall win a

case, but that justice shall be done."  Berger v. United States, 295 U.S. 78, 88 (1935).  Therefore,

> he is in a peculiar and very definite sense the servant of the law, the twofold aim of
> which is that guilt shall not escape or innocence suffer.  He may prosecute with
> earnestness and vigor – indeed, he should do so.  But, while he may strike hard
> blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from
> improper methods calculated to produce a wrongful conviction as it is to use every
> legitimate means to bring about a just one.

Id.  That said, it is also clear that "[p]rosecutors need not be empty vessels, completely devoid of

any non-case-related contact with, or information about, criminal defendants."  United States v.

Lilly,  983 F.2d 300, 310 (1st Cir. 1992).

    Here, Lyon's personal interest in this case, if any, was far too tenuous and remote to cause

legitimate concern.  He did not represent the victim; he represented the victim's *former father-in-*

*law*.  In addition, even that representation took place *more than a decade* before the instant

prosecution was even instituted. Courts have found no due process violation even where far closer relationships were at issue. See, e.g., Newman v. Fry, 873 F.2d 1092 (8th Cir. 1989) (finding that due process was not violated in a murder prosecution simply because one of the prosecutors was a friend of the victim). Although it might arguably have been preferable for Lyons to have been recused simply out of an abundance of caution and to prevent even the possibility of a claim such as this being later asserted, Lyons participation was not a violation of clearly established federal law, much less a violation so egregious as to warrant the extreme remedy of a federal court's intervention to invalidate a state conviction on collateral review. See Dick v. Scroggy, 882 F.2d 192, 196 (6th Cir. 1989) ("Absent a demonstration of selective prosecution, … even a clear appearance of impropriety in the participation of the prosecutor is normally insufficient to justify a decision, in collateral proceedings, to administer … the 'strong medicine' of setting aside a conviction of one found guilty beyond a reasonable doubt in a fair trial before an impartial judge and an unbiased jury."); Oakley v. Smith, No. 89-6473, 1991 WL 1117, at *3 (6th Cir. Jan. 8, 1991) ("Absent a demonstration of selective prosecution or comparable abuse of the criminal justice system, … the fact that a prosecutor may have had a personal interest in securing a conviction does not normally justify the allowance of a collateral attack on the conviction.").

For all of these reasons, this claim should likewise be denied.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application seeking habeas corpus relief filed by Leopold Lacoste, II, be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days

35

after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[62]

New Orleans, Louisiana, this ____2nd____ day of June, 2020.


_____
**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**


---

[62] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.